IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        **STATEMENT OF THE DEFENSE**

-v-                          **SENTENCING FACTORS**

JAVON HARDY,              6:20-CR-06172-001

             Defendant.

---

      In accordance with local procedural guidelines to govern sentencing procedures under the

Sentencing Procedure Act of 1984 in the Western District of New York; Rule 32 of the Fed. R.

Crim. P.; 18 U.S.C. § 3553; and <u>U.S. v. Booker</u>, 543 U.S. 220 (2005); <u>U.S. v. Crosby</u>, 397 F. 3d

103 (2d Cir. 2005);

      PLEASE TAKE NOTICE that the defendant, Javon Hardy, having reserved the right to

argue for a non-Guideline sentence in his plea agreement with the Government, hereby moves for

a non-incarceration sentence, and requests that in support of that sentence, the Court review and

consider the following discussion and attachments, including treatment documentation and letters

of support:

## **PROCEDURAL HISTORY**

      On July 8, 2020, a Criminal Complaint (6:20-MJ-00682) was filed against Mr. Hardy

charging him with Arson in violation of 18 U.S.C. § 844 (i) and 2. On July 15, 2020, Mr. Hardy

voluntarily surrendered himself and made his initial appearance before Magistrate Pedersen. The

Government did not move for detention and Mr. Hardy was released to pretrial supervision.

      On September 18, 2020, a violation of pretrial release was filed alleging that Mr. Hardy

had tested positive for marijuana. On September 24, 2020, Mr. Hardy appeared before

Magistrate Pedersen who admonished him and released him back to pretrial release. The Government did not move for detention at that time. On November 16, 2020, another violation of pretrial release was filed again alleging that Mr. Hardy had tested positive for marijuana. On November 30, 2020, Magistrate Pedersen revoked his release. Mr. Hardy surrendered himself as requested by the Court.

On December 15, 2020, Mr. Hardy waived indictment and pled guilty to a one count Information charging him with Riot in violation of 18 U.S.C. § 2102 (a). Mr. Hardy and the Government entered into a written plea agreement in which it was agreed that the defendant was a criminal history category of 1 and a total offense level of 17. The sentencing range under the guidelines is a term of imprisonment of 24-30 months and a period of post release supervision of 1-3 years. Both the Government and Mr. Hardy also reserved their right to argue for a sentence outside of the Sentencing Guidelines.

Mr. Hardy is scheduled for sentencing on March 18, 2021. Mr. Hardy is statutorily eligible for a sentence of 1 – 5 years of probation. 18 U.S.C. § 3561. Based upon the nature of the offense, Mr. Hardy's lack of criminal history, his young age, his acceptance of responsibility, and his history and character, I am respectfully requesting the Court impose a non-incarceration sentence.

## SENTENCING FACTORS

In consideration of the factors of 18 U.S.C. § 3553(a), and in determining a sentence "not greater than necessary, to comply with the purposes set forth in paragraph (2)" there is a significant amount of information that would support the imposition of a non-incarceration sentence in this case.

Mr. Hardy is 25 years old and was 24 years old at the time of the offense. He is a lifelong resident of the City of Rochester. His mother was a single mom who worked numerous jobs to support the family. Mr. Hardy did not have contact with his father and was raised primarily by his siblings while his mother worked. His brother was tragically killed by a drunk driver when he was younger. He currently lives with his mother and has two young daughters of his own whom he cares for and supports.

Mr. Hardy was diagnosed with lead paint poisoning as a child, for which his mother received a settlement. (See Letter from Monroe County Department of Law attached as Exhibit A). This caused him to have several learning disabilities. He was placed in special education classes at school. He required individual attention and extra time to complete tests and assignments. He has difficulty with speech and reading. Mr. Hardy recently disclosed that he was sexually abused as a young child and would like further counseling to deal with the lingering issues he has suffered as a result. Despite these challenges, Mr. Hardy attended high school through the 11th grade and received an award for excellent attendance. (See Award Certificate attached as Exhibit B). He then attended trade school where he studied to obtain a security guard license. He became involved in the Christians United for Israel program through the University of Buffalo. Every year as part of this program, he would travel to Washington DC to lobby with Congressmen for rights for people living in Israel. (See Global Leadership Summit Badges attached as Exhibit C).

Mr. Hardy has been consistently employed since he was 17 years old. He has worked in retail, for cleaning companies, and for promotional companies. Mr. Hardy's goal was to work in the criminal justice system and be an attorney. He now is training to become a fireman with his uncle. He is driven to maintain employment to support himself and his young children.

In his spare time, Mr. Hardy is involved with his church and community service work. He has worked as an usher, handed out food donations, and collected money for the Heart and Soul Community Church on Clinton Avenue. (See Church Documents attached as Exhibit D). He worked as a leader for the welcome committee for the church and has appeared in their recruitment brochures. During the holidays, Mr. Hardy takes time to volunteer at local soup kitchens. Recently, he has become involved in mixed martial arts and boxing as a way to deal with his stress in a positive manner.

As noted in the Presentence Investigation Report, Mr. Hardy is a criminal history category 1. Despite facing challenges growing up, this incident is the first contact Mr. Hardy has had with the criminal justice system. The state Arson charges stem from this same incident. It is our understanding that the state does not plan to continue to prosecute Mr. Hardy on those charges as a result of his plea in federal court. The only other arrest Mr. Hardy has is for Aggravated Unlicensed Operation of a Motor Vehicle in the Third Degree which is still pending in Irondequoit Town Court.

The Court is likely concerned with the violations of pretrial release that were filed during the pendency of the case. It should be noted that these violations only alleged marijuana use. There are no allegations Mr. Hardy was re-arrested, left the jurisdiction, or failed to report to probation. Prior to being placed on pretrial release, Mr. Hardy was a daily marijuana smoker and he has struggled with breaking this addiction. During the pendency of the case, he has been engaged with treatment at Huther Doyle. Notably, his counselor reports he has "made some big changes in a very short amount of time." (See Letter from Katerine Thompson attached as Exhibit E). Mr. Hardy's recent drug screens have been negative. If Mr. Hardy is placed on

probation, the Court can make it a condition that Mr. Hardy continue with his treatment and monitor his progress.

In accordance with 18 U.S.C. § 3553 (a) (6), the Court in imposing a sentence "shall consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This case centers around the protests that occurred in the City of Rochester following the death of George Floyd. While Mr. Hardy accepts full responsibility for his actions which led to his conviction, he did not attend the protest with the purpose of inciting violence. Rather, his original intent was to exercise his First Amendment right to protest and peacefully assist other activists. It should be noted that Mr. Hardy was not involved in any physical violence upon other individuals nor was he involved in looting which occurred on this day. Across the country, state prosecutors have been dismissing cases against individuals involved in similar protests that occurred during this time period. (See New York Times Article attached as Exhibit F). Recently, federal prosecutors dismissed 31 out of 90 protestor cases in Portland, Oregon. (See KGW News Article attached as Exhibit G). We ask the take these other cases into consideration when sentencing Mr. Hardy.

Regarding considerations under 18 U.S.C. § 3553 (a) (2), Mr. Hardy does not present any danger to the public. There are no allegations Mr. Hardy committed violence against an individual, threatened anyone, or intended to hurt anyone. Mr. Hardy has accepted responsibility and expressed remorse for his actions. He has no prior criminal record. The public is best served by him continuing to contribute to the community through his steady employment, support for his family, and his commitment to his church and community service. Additionally, he will be in a much better position to make restitution for the damages he is responsible for while on

probation than he would be if incarcerated. Thus, a non-incarceration sentence will better serve the community, Mr. Hardy, and his family.

## LETTERS OF SUPPORT

Please find the following letters of support attached:

1. Exhibit H – Agustin Rodriguez Sr., Director of Ibero American Investors Corp and former Director of Youth Services for Heart and Soul Church

2. Exhibit I – Dominic Keith, Javon Hardy's Uncle

## CONCLUSION

Mr. Hardy has pled guilty and accepted responsibility for his actions. The plea agreement allows for the parties to argue for a non-Guideline sentence. Based upon Mr. Hardy's history and character, lack of criminal record, and the facts of this case, it is respectfully requested that the Court order a non-incarceration sentence of time served with a period of supervised release or a term of probation found to be appropriate by the Court under these circumstances.

For all the reasons stated above, it is respectfully requested that the Court grant the sentence of time served with supervised release or a term of probation. Thank you for your consideration.

Dated: March 5, 2021
      Rochester, NY

                          Respectfully submitted,

                          s/ James C. Egan
                          James C. Egan, Esq.
                          Attorney for Defendant
                          Law Office of James C, Egan, PLLC
                          Rochester, New York 14614
                          Phone: (585) 510-5101
                          E-mail: jegan@jameseganlaw.com

cc:      Douglas Gregory, Esq.- United States Attorney's Office

Exhibit A




# Department of Law
## Monroe County, New York

**Cheryl Dinolfo**
*County Executive*

**Michael E. Davis**
*County Attorney*

December 3, 2018

Elizabeth Allers, Esq.
Athari & Associates, LLC
46 Oxford Road
New Hartford, New York 13413

**RE:** Javon Hardy – MCDSS Persona Injury Lien
Lead Poisoning

Dear Ms. Allers:

Please be informed that the Monroe County Division of Social Services' lien regarding the above-captioned matter remains at **$121.75** for Medicaid paid for the diagnosis and/or treatment of lead poisoning.

Please reference Maestro #131749, make your check payable to "New York State Department of Health" and mail to:

NEW YORK STATE DEPT OF HEALTH
P. O. Box 415874
Boston, MA 02241-5874

In addition, please send me copies of the cover letter to NYS DOH and a copy of the settlement statement so I may file a Release after payment is verified.

Thank you for your courtesy and cooperation with this office.

Very truly yours,

SUSAN G. FITTOS
Resource Recovery Technician
(585) 753-1481

/sgf

Exhibit B

# Excellent Attendance Award

Presented to

## JAVON HARDY

By the Rochester City School District
in Recognition of ... Attendance





_Bolgen Vargas_, Superintendent of Schools

_Van White_, Board of Education President

GRADE: 10    ROOM: N/A

EAST HS (G)

Exhibit C



**THE GLOBAL LEADERSHIP SUMMIT**

**NAME:**

JAvon
HArdy



CHRISTIANS UNITED FOR ISRAEL

WASHINGTON

SUMMIT

CUFI ON CAMPUS

Javon
Hardy

University at Buffalo, School of Law

CD-25

JULY 8-9, 2019

# Summit

WASHINGTON

**SATURDAY, 15TH**

4:30pm
Registration Opens

5:30pm – 8:45pm
Kick-off Mixer

**SUNDAY, 16TH**

9:00am – 12:30pm
Morning Sessions

12:30pm – 1:45pm
Lunch Plenary

1:45pm – 6:00pm
Afternoon Sessions

6:00pm – 7:00pm
Closing Session

**MONDAY, 17TH**

8:00am – 7:00pm
Registration

9:00am – 10:00am
Jerusalem Jubilee
Celebration

10:00am – 11:00am
Capitol Hill Talking Points

11:00am – 11:45am
Regional Meetings

11:45am – 1:30pm
Lunch Break at the CUFI
Café

1:30pm – 2:00pm
Israeli Prime Minister
Benjamin Netanyahu

2:00pm – 4:00pm
The Middle East Briefing

4:15pm – 6:30pm
Dinner break at the
CUFI Café

7:30pm – 9:30pm
A Night to Honor Israel

**TUESDAY, 18TH**

8:00am – 10:30am
View from the Hill

10:45am – 5:00pm
Capitol Hill Meetings

6:00pm – 8:00pm
CUFI on Campus Wrap-Up
Night

OFFICIAL CUFI SUMMIT BADGE MUST BE WORN AT ALL TIMES AND IS NON
TRANSFERABLE. NO ADMISSION WITHOUT BADGE. CUFI RESERVES THE
RIGHT TO DENY ACCESS TO PARTICIPANTS WHO BREAK OR ARE DEEMED
OR TO BE DISRUPTIVE WITHOUT REFUND OR CREDIT FOR ANY MANNER. IT
TAKEN INSIDE CONFERENCE OR AUDIO RECORDING, PART, PHOTOGRAPHY
SESSIONS OR RELEVANT COPY MAY, WRITTEN PERMISSION ANY RECORDING
RESERVES THE RIGHT TO REVIEW AND/OR PROHIBIT OF CUFI AND
PECTATION TO BE ENTITLED TO POSSESS ON WITHOUT EX-
OUT OFFICIAL CUFI PRESS CREDENTIALS. YOU, NO MEDIA MAY ATTEND SUMMIT WITH-



WASHINGTON

# Summit
## 2017
JULY 17-18

Javon
Hardy

University of Buffalo

CD-25

CUFI
ON CAMPUS

# Summit

WASHINGTON

**SATURDAY, 15TH**

4:30pm
Registration Opens

5:30pm – 8:45pm
Kick-off Mixer

**SUNDAY, 16TH**

9:00am – 12:30pm
Morning Sessions

12:30pm – 1:45pm
Lunch Plenary

1:45pm – 6:00pm
Afternoon Sessions

6:00pm – 7:00pm
Closing Session

**MONDAY, 17TH**

8:00am – 7:00pm
Registration

9:00am – 10:00am
Jerusalem Jubilee
Celebration

10:00am – 11:00am
Capitol Hill Talking Points

11:00am – 11:45am
Regional Meetings

11:45am – 1:30pm
Lunch Break at the CUFI
Café

1:30pm – 2:00PM
Israel Prime Minister
Benjamin Netanyahu

2:00pm – 4:00pm
The Middle East Briefing

4:15pm – 6:30pm
Dinner break at the
CUFI Café

7:30pm – 9:30pm
A Night to Honor Israel

**TUESDAY, 18TH**

8:00am – 10:30am
View from the Hill

10:45am – 5:00pm
Capitol Hill Meetings

6:00pm – 8:00pm
CUFI on Campus Wrap-Up
Night

OFFICIAL CUFI SUMMIT BADGE MUST BE WORN AT ALL TIMES AND IS NON-TRANSFERABLE. CUFI RESERVES THE RIGHT TO DENY ACCESS TO AND/OR REMOVE ANY PARTICIPANT WHO IS DEEMED DISRUPTIVE WITHOUT REFUND OR CREDIT. NO VIDEO OR AUDIO RECORDINGS ARE PERMITTED. ANY PHOTOS TAKEN INSIDE CUFI'S SUMMIT PREMISES ARE THE SOLE PROPERTY OF CUFI AND SUBJECT TO RELEVANT COPYRIGHT PROTECTIONS AND PROPERTY OF CUFI. CUFI RESERVES THE RIGHT TO REVIEW AND/OR TAKE POSSESSION OF ANY EX-PECTATION TO BE EXPOSED TO YOU. NO MEDIA MAY ATTEND SUMMIT WITH-OUT OFFICIAL CUFI PRESS CREDENTIALS.

# Exhibit D



# Certificate of Church Membership

This certifies that

JAVON HARDY

was received into full membership in the

HEART AND SOUL COMMUNITY _____ Free Methodist Church

on the _19th_ day of _SEPTEMBER_, 20_16_

_signature_, Pastor

# Certificate of Baptism



This certifies that

**JAVON HARDY**

baptized in the

HEART & SOUL COMMUNITY CHURCH

on the 29ᵗʰ day of January , 20 17



_____ , Pastor

**SECURITY**

Javon

HEART & SOUL
COMMUNITY CHURCH

Exhibit E



Where hope lives, healing begins,
and everything is possible!

January 19, 2021

**Progress Report**

**Hardy, Javon**
**84 Lux St**
**Rochester, NY 14609**
**DOB: 10/15/95**

Dear Mr. Hardy,

You were reffered to our agency by Federal Probation for a drug and alcohol evaluation. You attended your evaulation on 8/11/20 and were given the diagnosis of a mild use disorder for marijuana. You attended your medical screen on 8/20/0. You attended your orientation on 8/21/20. You started attending psychoeducation sessions over telehealth, with your counselor on 8/24/20. In December of 2020 you continued to test postive for marijuana and were incarcarted on a violation of probation. Your diagnosis was upgraded to a moderate use disorder for marijuana as a result of your use. You resumed your sessions with your counselor on 12/30/20 and have kept your weekly appoitments to date. It is worth noting the change in your attitude and in the clarity of your thinking. You are more positve about the direction you want to take your life and appear to be more motivated to make those changes. Your thinking is clear and consise. You have made some big changes in a very short amount of time. Your counselor is confident that if this continues you will be very successful in your life and have the abliity to help others.

Best Regards,

Katherine Thompson, B.S
Addictions Counselor
Huther Doyle
Telehealth number: 585-298-0932
Office Number: 585-325-5100

Exhibit F

# *Why Charges Against Protesters Are Being Dismissed by the Thousands*

Prosecutors declined to pursue many of the cases because they concluded the protesters were exercising their basic civil rights.



By **Neil MacFarquhar**

- Published Nov. 19, 2020Updated Feb. 11, 2021

LOUISVILLE, Ky. — Matt Kaufmann loved bringing real-world issues into his classroom, but he never expected he would become a lesson himself. The headlines, however, made it hard to avoid: "Kentucky High School Teacher of the Year Arrested," blared the local news after he was detained on May 31.

An English teacher at Marion C. Moore School at that time, Mr. Kaufmann was among more than 800 people swept up by the police in Louisville during the many months of demonstrations prompted by the police killings of George Floyd in Minneapolis and Breonna Taylor in Louisville.

Mr. Kaufmann and his fiancée, protest novices, joined a large downtown crowd in late May, he said, when police officers began to break up the demonstration by firing tear gas and charging from all sides. With a helicopter thumping overhead, he suddenly found himself lined up on the ground with dozens of other protesters, then hauled off to a crowded jail cell.

"I had never experienced anything like that before," Mr. Kaufmann, 41, said. "It was scary."

Now, more than five months later, as Mr. Kaufmann's case and those of thousands of others finally land in courts across the United States, a vast majority of cases against protesters are being dismissed. Only cases involving more substantial charges like property destruction or other violence remain.

Prosecutors called the scale of both the mass arrests and mass dismissals within a few short months unrivaled, at least since the civil rights protests of the early 1960s. With

the police detaining hundreds of people in major cities, the arrests this year ended up colliding with the limitations of the court system.

In the aftermath, prosecutors declined to pursue many of the cases because they concluded that the protesters were exercising their basic civil rights. Cases involving free speech or free assembly rarely succeed in court, according to prosecutors across the country, and the coronavirus pandemic also played a role in the decision. A wave of thousands of minor cases threatened to capsize courts already floundering under hefty lockdown backlogs.

There was also the recognition that law enforcement officers often use mass arrests as a technique to help clear the streets, not to confront illegal behavior.

For those handling the cases, the task has felt Sisyphean. "Every day I would think I was done and the next morning there would be 50 or 100 cases to tally," said Mary Ellen Heng, a deputy city attorney for Minneapolis. So far the city is pursuing about 75 of 666 cases.

"What's happened in the last few months here is nothing like I have seen in my 23 years when it comes to the volume of cases," she said.

Most charges in the almost 300 federal protest cases involve arson or assaulting police officers, as do the state and municipal cases.

"This is the hangover from months of protests," said Ted Shouse, a criminal defense attorney in Louisville who helped to organize more than 100 volunteer defense attorneys.

Protest leaders and defense attorneys nationwide accuse the police of piling on charges to try to halt the demonstrations. "It was to squelch dissent," said Attica Scott, the only Black woman in the Kentucky State Legislature and one of the protest organizers detained by the police.

The arrest of Ms. Scott in September has become one of the most contentious cases in Louisville because she and several other protest leaders were initially accused of trying to ignite a library, a felony, and of violating a 9 p.m. curfew.

The Jefferson County attorney, Mike O'Connell, appeared in court himself to ask that the felony charges be dropped after reviewing the evidence, including a live Instagram broadcast by Ms. Scott with a time stamp showing that the arrests came before curfew.

Defense attorneys working on cases in numerous cities said more people of color than white people were charged, but it was not a universal pattern. "Even adjusting for the racial makeup of the protests, Black people have been charged out of proportion," Mr. Shouse in Louisville said.

A recent study by The Louisville Courier-Journal found that Black people constituted 53 percent of those arrested there during the four months starting May 29, but that they faced 69 percent of the felony charges. In Portland, Ore., which is predominantly white, white defendants constituted 65 percent of the more than 140 cases moving forward, while 32 percent were from other racial groups.

Sgt. John Bradley, a spokesman for the Louisville Metro Police Department, said that officers made arrests on the basis of Kentucky law, and that it was up to the county attorney whether to prosecute.

Precise numbers on both arrests and dismissals nationwide are elusive amid the complicated patchwork of law enforcement agencies and the state, county or city prosecutors involved.

In Los Angeles County, for example, the district attorney declined to file criminal charges against 334 people but is pursuing 257 cases of people arrested between the end of May and the beginning of August, said Greg Risling, a spokesman.

But not all jurisdictions in Los Angeles County are dismissing cases. Beverly Hills is pursuing misdemeanor charges against a group of 25 people stemming from one protest in June and plans to pursue others from another protest in July, said Rachel Steinback, the coordinator for the National Lawyers Guild of Los Angeles's Mass Defense Committee.

In Portland, the Multnomah County District Attorney's Office boiled its numbers down into a neat chart: District Attorney Mike Schmidt has rejected 721 cases, is pursuing 144 and has 165 under review.

Based on the example of Occupy Wall Street protesters a decade ago, Mr. Schmidt knew that judges would toss out most cases or impose small sentences. "Seventy to 80 percent would not survive constitutional challenges," said Mr. Schmidt, who added that the costs far outweighed any benefit to public safety.

Adding 1,000 cases to the yearly average of under 20,000 would be daunting, he said. The same is true for the Minneapolis city attorney, whose office handles some 15,000 misdemeanors annually. "Even if Covid was not a problem, it would be a monstrous task for us to prosecute 500 additional cases," Ms. Heng said.

Walk into virtually any large courthouse in America and the strain of dealing with the case backlog is palpable.

In Louisville, those cases are referred to as being in the "parking lot." There are some 22,000 such cases over all, with just four of 10 trial courts functioning in the Jefferson County Courthouse. Across two days in late October, 300 protest case arraignments were jammed onto the calendar, about 10 times the normal rate.

Judge Lisa Langford briefly lost track of which cases were in the courtroom and which were on Zoom. "He has been waving at me, I thought he was just happy to see me," she joked after locating a lawyer on Zoom.

Prosecutors have moved to dismiss 219 protest cases, said Josh Abner, the spokesman for the Jefferson County attorney.

"We don't have a magic wand that we can wave in connection with all these cases," said Mr. O'Connell, noting that a team of four prosecutors was combing through them.

After mass arrests during the 2000 Republican National Convention, Philadelphia legislated a lesser charge to get people off the streets. Police officers started issuing summonses outside regular courts. Misdemeanors and felonies go to the district attorney, while summonses do not.

Larry Krasner, the city's district attorney, said that his office was reviewing 586 cases and that the city was dropping up to 2,000 summonses. Cases being reviewed involve incidents like breaking into stores or torching police vehicles.

Prosecutions there and elsewhere were also curtailed by the chaotic nature of the demonstrations, especially during the first few weeks when most arrests occurred. With the police working double shifts, paperwork lagged, so finding reports or witnesses for some cases proved impossible.

In Louisville, as the months drag on with the charges dangling overhead, many protesters feel stuck in limbo.

Kelly Parry, 33, both a volunteer defense attorney and a defendant, was among some 76 protesters arrested while blocking an avenue in July. "It is mentally draining not knowing what might happen to you," she said. "You are constantly thinking, 'Is this a small situation or will it become something bigger?'"

Mr. Kaufmann, the teacher, was charged with a curfew violation, a misdemeanor, but tried to ignore it. "I don't want to give in to fear," he said, focusing instead on his new job within the Jefferson County school system that involves helping to develop a social justice curriculum.

He and Stephanie Kornexl-Kaufmann, then his fiancée and now his wife, decided to join the protesters after hearing the recording of the 911 call that Kenneth Walker, Ms. Taylor's boyfriend, made as the police broke into her apartment during a botched drug raid.

"We were dumbfounded, we were shocked," Mr. Kaufmann said. "The country does not live up to the values that we have been teaching in class."

Mr. Kaufmann had been named the state's high school teacher of the year partly for building classroom discussions around real-world issues like the #MeToo movement. But none had hit quite so close to home.

News of his arrest spread at lightning speed.

Kaelyn Goatley, 17, a senior at Marion C. Moore School, had to explain to her grandmother, who was initially appalled, why Mr. Kaufmann's arrest was a good thing.

"I was proud that I had a teacher who was out on the streets fighting for justice," she said. "He has this big title being high school teacher of the year and the fact that he was out there protesting and being arrested meant that he risked that. It shows how adamant he is about making change."

In late October, Mr. Kaufmann learned that the charges against him, his wife and a former student who was with them would be dropped. He was elated but noted that hundreds of cases were still pending.

"My young Black male and female friends who I met through the protests were in greater danger than I was and some of them are still dealing with these charges," he said. "It is not fair, it is not consistent and we have to do better."

Neil MacFarquhar is a national correspondent. Previously, as Moscow bureau chief, he was on the team awarded the 2017 Pulitzer Prize in International Reporting. He spent more than 15 years reporting from around the Mideast, including five as Cairo bureau chief, and wrote two books about the region. @NeilMacFarquhar

A version of this article appears in print on Nov. 20, 2020, Section A, Page 1 of the New York edition with the headline: Most Charges From Protests Are Dropped. Order Reprints | Today's Paper | Subscribe

Exhibit G

# Feds quietly dismiss dozens of Portland protest cases

KGW found 31 of 90 protest cases have been dismissed by the U.S. Department of Justice, despite warnings there would be "consequences for acts of violence."

Author: Kyle Iboshi (KGW)
Published: 1:49 PM PST March 2, 2021
Updated: 1:49 PM PST March 2, 2021

PORTLAND, Ore. — Federal prosecutors have dismissed more than one-third of cases stemming from last summer's violent protests in downtown Portland, when protesters clashed with federal agents. KGW reviewed federal court records and found 31 of the 90 protest cases have been dismissed by the U.S. Department of Justice, including a mix of misdemeanor and felony charges.

Some of the most serious charges dropped include four defendants charged with assaulting a federal officer, which is a felony. More than half of the dropped charges were "dismissed with prejudice," which several former federal prosecutors described as extremely rare. "Dismissed with prejudice" means the case can't be brought back to court.

The dismissal of protest cases runs counter to the tough talk coming from the U.S. Department of Justice last summer. Billy Williams, then-U.S. Attorney for Oregon, vowed there would be consequences for the nightly graffiti, fires and vandalism outside the Mark O. Hatfield United States Courthouse.

"Make no mistake: those who commit violence in the name of protest, will be investigated, arrested, prosecuted, and face prison time," said Williams in a Sept. 25, 2020 press release.

In a recent interview with KGW, Williams explained the cases were dismissed in instances where prosecutors didn't believe they could prove a case beyond a reasonable doubt.

"Each case was analyzed for the evidence that we had at the time," said Williams. "Careful decisions were made on whether or not someone should be charged based on the evidence."

Williams explained decisions are made on a case-by-case basis.

"Everything is case-specific when you go about these cases being processed through the system," said Williams, who stepped down on Feb. 28. U.S. attorneys are traditionally asked to resign at the start of a new administration.

Federal prosecutors rarely handle protest cases. But when Multnomah County District Attorney Mike Schmidt passed on most protest cases saying he was reserving resources for the most serious crimes, the feds stepped in. Then-Attorney General William Barr reportedly instructed federal prosecutors to aggressively pursue protesters deemed violent or destructive.

"I've never made a decision in my career based upon political pressure or institutional pressure," said Williams.

By summer's end, scores of people would be arrested on various federal charges by agents guarding the federal courthouse in Portland. The names and ages of those arrested were published by the U.S. Department of Justice and U.S. Homeland Security in press releases. Additionally, photos of defendants' belongings, from helmets to gas mask to goggles, were included in court documents.

*Credit: U.S. Dept. of Justice*

Most of the defendants whose protests cases are still pending have seen their trials delayed, largely because of the pandemic. Those defendants face a mix of felony and misdemeanor charges. Three defendants cut plea deals resulting in probation and home detention. Two of the plea agreements required a relatively short prison sentence of 30 days. Several people closely involved with the protest cases, who asked not to be identified, said they expect many more federal charges to be dismissed soon.

Laura Appleman, a law professor at Willamette University who is not directly involved in these cases, believes federal prosecutors aren't making decisions based on politics. Rather, she thinks they're considering resources and an already busy caseload.

"The U.S. Attorney's office has to go through and very carefully ask, 'Is it worth using our limited time and energy to prosecute each and every of these federal misdemeanors?'" Appleman explained.

The most vigorous legal fight, laid out by public defenders in lengthy court filings, has involved nearly a dozen Portland protesters charged with "civil disorder." Defense attorneys argue the obscure law enacted during the 1960s civil rights era is unconstitutional.

At least 11 of the dismissed federal protest cases were dropped on or after the inauguration of President Joe Biden. With a new president and soon new a U.S. Attorney in Oregon, it's unclear how these cases will be handled going forward. Like the protests themselves, there will undoubtedly be opposing views. Some will argue by dismissing cases, there's no accountability while others will claim the feds never should have filed protest cases in the first place.

Exhibit H

 Gmail

James Egan <jegan@jameseganlaw.com>

---

## (no subject)
1 message

---

Javon Hardy <javonhardy86@gmail.com>                    Wed, Jan 20, 2021 at 3:12 PM
To: "jegan@jameseganlaw.com" <jegan@jameseganlaw.com>



To whom it may concern:

I am Agustin Rodriguez, Sr. Director of Ibero American Investors Corp. I am also a founding Partner of a marketing firm, Frameworks Creative. I serve in various boards and leadership roles in local faith base non-profits, one of which is at Heart and Soul Church at the corner of North Clinton Ave and Ave D. While in service as Director of Youth Services from 2015-2020, I had the opportunity to meet Javon Hardy. He stood out to me since he was not ethnic Sudanese as the rest of our youth group teens and young adults, but he made friends with the older youth and started coming to the weekly youth services. Eventually, we began to meet one on one about once a month for a couple years. Turns out, at that time, he was a neighbor of mine at the Homestead Heights neighborhood over at the Southeast Quadrant of the City of Rochester.

Javon has a complicated background. Most kids cover up their secrets and complicated feelings well with smiles and courteous mannerism around me even when they have nothing to lose. Not Javon. He was frank. He speaks in hyperbole to make his stories sound more grandiose, but eventually gets to the point of things and is not afraid to take on the tough questions and observations. He is stubborn, as you might expect from a young man who has had to grow up quickly to fill up the role of the 'man of the house' with his father's absence. Yet, teachable. His confrontations are rarely to protect something hidden, rather, they are about finding truth in a conversation and to sniff out any hypocrisy from the person he converses with. I can say this with authority since I can relate very much to him on this side of this personality.

I am a foster parent of a teenager myself through the Catholic Family Center. Working with teens under your house is a completely different ball game than working with young children, so I will not pretend to understand what is like to be a father of two baby girls. During the time we spent while as youth

director, I saw Javon love his first daughter (then his only one) and was not afraid to welcome her into his childhood home. He brings her in with all the good, the bad, and the ugly, just the way family is. He continued to be a provider for his daughter the way he had historically done for his mother.

Javon has his undergraduate in pre-law from the University of Buffalo. I believe his ambition to become a lawyer will prove to be an asset in the court rooms. His unique story of overcoming challenges of his youth will make him an approachable lawyer in the future for many people who have experience similar stories. Empathy and experience will be his greatest assets when he represents the underrepresented in court rooms that may not be as gracious.

Of the youths I have served in my time as youth director at the local church, a hand full of those teens will make something out of their lives, serving something bigger than themselves. I believe Javon is among the few that will.

Sincerely,

Agustin Rodriguez
Aus.agu.rod@gmail.com
585-729-3164



Exhibit I

My nephew Javon Hardy is a stand up citizen. He has always stayed out of trouble. He has mentioned several times he would like to pursue something in the fire department like I did. I know he made a mistake by being where he was, but that is out of character for him. He is doing his counseling and trying to better himself.

Sincerly,

Dominic Keith    Lions Firefighter